| | |
|---|---|
| JOSEPH KATZ, and wife CHAYA KATZ, | **Index No.** |
| Plaintiffs, | |
| -against- | **VERIFIED COMPLAINT** |
| CHESKEL LANDAU, and wife, ETYA LANDAU, CONGREGATION YETEV LEV D'SATMAR, INC., RABBI YAAKOV BER TEITELBAUM, CONGREGATION ATZEI CHAIM OF SIGET, INC., PRO MED STAFFING RESOURCE, INC., and MENDY HIRSCH, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

      **COME NOW** Plaintiffs, JOSEPH KATZ (sometimes "Plaintiff" or "Katz") and wife, CHAYA KATZ, (sometimes "Plaintiff Chaya Katz" or "Chaya Katz") in the referenced matter, by way of their attorney, Scott C. Levenson, Esq., of Levenson Law Group, complaining of the Defendants CHESKEY LANDAU, ("Defendant Landau" or "Landau") and wife, ETYA LANDAU, (sometimes "Landau's wife"), CONGREGATION YETEV LEV D'SATMAR, INC., (hereinafter "Satmar"), RABBI YAAKOV BER TEITELBAUM, (sometimes "Rabbi Yaakov Ber" or "Yaakov Ber"), CONGREGATION ATZEI CHAIM OF SIGET, INC. (hereinafter "Cong Atzei"), PRO MED STAFFING RESOURCE, INC., (hereinafter "Pro Med") and MENDY HIRSCH, (hereinafter "Hirsch").

      Plaintiffs bring this civil action against Defendant Landau under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964 ("RICO"), as well as for fraud, conversion; breach of fiduciary duty; breach of contract, fraudulent inducement, negligent

misrepresentation, unjust enrichment, intentional infliction of emotional distress and for attorneys fees.

Plaintiffs bring this civil action against the remaining Defendants under the RICO Act, as well as for aiding and abetting the fraud committed by Defendant Landau, for unjust enrichment, for the intentional infliction of emotional distress and for attorneys fees.

Defendant Landau is the culpable person according to the RICO statute, with the requisite *mens rea,* who advanced a scheme and enterprise to defraud, and who did defraud the Plaintiffs of money and opportunities that rightfully belonged to them, causing them numerous injuries and damages as will be described herein. The acts and omissions of Defendant Landau, as set forth herein which are violations of RICO include, but are not limited to wire fraud, and embezzlement. The acts and omissions of Defendant Landau, as described herein, were committed over a substantial period of time, were continuous and interrelated, and had an effect on interstate commerce.

The remaining Defendants collectively assisted in the enterprise by: (1) sheltering and protecting Defendant Landau, and his assets, (2) employing him, (3) providing a shield for him to hide behind, (4) sending Plaintiffs money on Defendant Landau's behalf, (5) attempting to buy Plaintiffs' silence, and otherwise by working together in furtherance of the common illegal interest of the enterprise Defendant Landau concocted. All Defendants have thereby been unjustly enriched by the scheme described herein, and all are jointly and severally liable for the damages inflicted upon Plaintiffs directly by Defendant Landau.

The acts and omissions by all Defendants, as described herein, have been, are and will be continually financially devastating for Plaintiffs. In addition, these acts and omissions negatively impacted and had a deleterious and substantially injurious effect upon the standing, reputation,

relationships, health, welfare and well-being of Plaintiff Katz, Plaintiff Chaya Katz and by extension upon their five-year old son. These acts and omissions were committed with the intent to inflict and did inflict severe emotional distress upon Plaintiffs, as well as other damages, as will be described more fully below. In light of all of the foregoing, Plaintiffs respectively show to this Court and allege as follows:

## I. PRELIMINARY STATEMENT

1.      This matter involves the fraudulent inducement in order to obtain, and then the misappropriation and theft of $1.3 million by Defendant Landau of Plaintiff Katz's capital contribution toward First Health Pro, Inc., a limited Partnership started by the two parties. It involves the the financial and personal fallout which Defendant Landau's fraud created for both Plaintiffs, and of the ongoing devastation upon their lives by the entire illegal enterprise maintained and protected by the remaining RICO Defendants as they have sheltered and continue to shelter, protect and shield Defendant Landau from liability for his actions and omissions as described herein.

2.      This is a plenary action against Defendant Cheskey Landau for violations under RICO, as well as for fraud, conversion, breach of fiduciary duty, breach of contract, fraudulent inducement, unjust enrichment, negligent misrepresentation, intentional infliction of emotional distress and for attorneys fees.

3.       It is further brought against Defendants Etya Landau, Congregation Yetev Lev D'satmar, Inc., Rabbi Yaakov Ber Teitelbaum, Congregation Atzai Chaim of Siget, Inc., Pro Med Staffing Resource, Inc. and Mendy Hirsch for RICO violations, unjust enrichment, aiding and abetting fraud, intentional infliction of emotional distress, and for attorneys fees.

4.      Plaintiff Katz and Defendant Landau have known each other for the past ten (10) years.  They were best friends when they went to high school together at Satmar High School in Queens, New York.  Due to the long-standing close friendship, Plaintiff Katz trusted Defendant Landau implicitly. Defendant Landau was literally the last person on earth that Plaintiff Katz would have ever thought would defraud him, lie to him or betray him.

5.      In or around September of 2020, Defendant Landau approached the Plaintiff regarding an investment idea, explaining to Plaintiff that he was knowledgeable and experienced in the business of providing medical staffing. Defendant Landau explained that he had an account - a medical facility, which needed medical staffing; that the company pays their full payroll ahead of time, for the first few months; that there was this new account and that for this they needed an initial large investment up front.  Defendant Landau explained that because of this payroll advance, Plaintiff would not make any return on his investment for the first few months, but that eventually he would make a lot of money at a comparatively high rate of interest.

6.      Plaintiff was very interested in the idea and asked Defendant Landau for a Partnership Agreement.  Defendant Landau agreed to this.  While the terms of the Partnership Agreement were under consideration, Plaintiff put up an initial investment for the Partnership.

7.      The Plaintiff and Defendant Landau then entered into a Partnership Agreement to create a medical staffing agency called First Health Pro, Inc., (sometimes "the Company"), and to engage in any other business that the Partners, according to the terms of the Agreement, would jointly determine.  A copy of the Articles of Partnership (hereinafter "Agreement") is attached hereto as **Exhibit A.**

8.      Unbeknownst to Plaintiff, Defendant Landau had created the entire enterprise in order to defraud Plaintiff and merely wanted the investment funds for himself.  Landau had no

intention of using Plaintiff's capital contribution for the purposes for which the Partnership had been created. Defendant thereby fraudulently induced Plaintiff to invest his money into the Partnership, and then took Plaintiff's capital contributions and used them for his own personal desires, breaching the Partnership Agreement, and intentionally defrauding and damaging Plaintiff Katz and his wife, Chaya Katz.

9.      In furtherance of this fraudulent enterprise, Defendant Landau showed to Plaintiff Katz fraudulently concocted Accounts Receivable spreadsheets from medical facilities, purporting that these were facilities that the Partnership was providing staffing for. He did this in order to induce Plaintiff Katz to invest further funds into the Partnership. Defendant Landau also made numerous wire transfers and other banking deposits into the Company's multiple bank accounts, which Plaintiff Katz had access to, fraudulently inducing Plaintiff Katz to believe that these were revenue deposits from the Business. In fact they were funds from other investors which Defendant Landau had received by defrauding other individuals.

10.      Eventually Defendant Landau succeeded in defrauding Plaintiff Katz of over $1.3 million in personally invested funds. In addition that that, once he uncovered Defendant Landau's scam operation, Plaintiff had to borrow over $10 million to pay his debts, as a direct and proximate result of the fraud committed by Defendant Landau. Plaintiff Katz and his wife Chaya Katz both became physically and emotionally unwell as they discovered how they had been used and defrauded. Due to not being able to pay their debts, they were ostracized by their families and by their community, all as a direct and proximate result of the acts and omissions of Defendants, as described herein. Both Plaintiffs have suffered numerous quantifiable and non-quantifiable damages as a direct and proximate result of the acts and omissions of all defendants.

11.     A RICO enterprise is "any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  All Defendants, apart from Defendant Landau, assisted Defendant Landau in avoiding responsibility and liability for his acts and omissions as described herein.

12.     For all of the foregoing, Plaintiffs seek a multitude of compensatory and punitive damages to be paid jointly and severally by all Defendants stemming from all Defendants' acts and omissions as described herein.

## II. <u>THE PARTIES</u>

13.     Plaintiff JOSEPH KATZ is an individual residing in Rockland County, New York. He invested substantial amounts of money into the Partnership, as a result of being lied to, cheated, deceived, and defrauded directly by Defendant Landau, and indirectly by the remaining Defendants.

14.     Plaintiff CHAYA KATZ is an individual residing in Rockland County, New York. She is the wife of Plaintiff Joseph Katz, and has been substantially injured and damaged by the acts and omissions of all Defendants.

15.     Defendant CHESKEL LANDAU is an individual residing in Kings County, New York.  He is the "culpable person" pursuant to the RICO Act.

16.     Defendant ETYA LANDAU, is the wife of Defendant Cheskel Landau, and is an individual residing in Kings County, New York.  She personally assisted Defendant Landau in hiding from and avoiding making restitution to and reimbursing the Plaintiffs for the money that he stole from them.

17.      Defendant CONGREGATION YETEV LEV D'SATMAR, INC. is, upon information and belief, a religious corporation organized under the laws of New York with a

principal place of business at 152 Rodney Street, Brooklyn, New York 11211. Satmar sheltered, protected and shielded Defendant Landau from liability for his acts and omissions as described herein.

18.     Defendant RABBI YAAKOV BER TEITELBAUM is an individual residing at 1511 50th Street, Brooklyn, NY 11219. He is the son of Zalman Teitelbaum, the Grand Rabbi of Satmar. Yaakov Ber personally sheltered, protected and shielded Defendant Landau from liability for his acts and omissions as described herein.

19.     Defendant CONGREGATION ATZEI CHAIM OF SIGET is, upon information and belief, a religious corporation organized under the laws of New York with a principal place of business at 1150 50th Street, Brooklyn, NY 11219 Defendant Cong Atzei personally sheltered, protected and shielded and continue to shelter protect and shield Defendant Landau from liability for his acts and omissions as described herein.

20.     Defendant PRO MED STAFFING RESOURCE, INC. is a corporation organized under the laws of New York with a principal place of business at 16 W 36th St 7th Floor, New York, New York, 10018. Defendant Pro Med employed and still employees Defendant Landau in a manner that shields him from liability and thereby sanctions his acts and omissions that injured and continue to injure the Plaintiffs, as described herein.

21.     Defendant MENDY HIRSCH is an individual residing in Kings County, New York. He is the CEO of PRO MED STAFFING RESOURCE, INC. Defendant Hirsch is the Executive Director of Defendant Pro Med, and is the direct supervisor of Defendant Landau. Defendant Hirsch personally sheltered, protected and shielded and continues to shelter, protect and shield Defendant Landau from liability for his acts and omissions as described herein.

### III. JURISDICTION AND VENUE

22.     The Court possesses jurisdiction under 28 U.S.C.§ 1331.   Plaintiffs' claims present a federal question.

23.     Venue is proper in the Southern District of New York.  The Plaintiffs are located and residing in Rockland County New York.  A substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in Rockland County, New York.  28 U.S.C. § 1391(a)(2). Defendants transacted many of their affairs with Plaintiffs in Rockland County, New York. 18 U.S.C. § 1965(a).  Rockland County, New York, is located within the Southern District of New York State.

### IV. STATEMENT OF FACTS

24.     The Partnership entered into by Plaintiff Katz and Defendant Landau began on January 1, 2021.  The Partnership Agreement was signed and notarized by both Plaintiff Katz and Defendant Landau on May 26th, 2021.  According to the terms of the Agreement, Plaintiff agreed to put up an initial capital contribution of $200,000.  At the time of signing, Plaintiff Katz had already contributed $75,000 towards the partnership. Plaintiff Katz contributed another $55,000 on the date of execution of the Agreement, and an additional $70,000 six (6) weeks after the execution of the Agreement.  **(Exhibit A, pp. 2-3, Section 5.1)**

25.     Defendant Landau made no capital contribution toward the Partnership.  **Exhibit A, p. 3, Section 5.1)**  Defendant Landau's role in the Partnership was to handle the day-to-day operations of the Business, including hiring and firing employees, general office management, opening and maintaining bank accounts, collections and anything else required by the Partnership in order to perform its business.  **(Exhibit A, p. 5, Section 8.2)**

26.     Plaintiff Katz's role was to provide capital for, and handle the financial aspects of the Partnership, including bookkeeping, accounting and raising capital. Plaintiff was to have access to all of the Partnership books and records, bank information, and logins.  Plaintiff agreed to fund the business on an as needed basis as agreed to by the Partners, or by his own decision through personal capital, loans, lines of credit, credit cards, or personal loans.  **(Exhibit A, p. 5, Section 8.3)**

27.     The Agreement gave Defendant Landau a 60% interest in the partnership, and Plaintiff Katz a 40% interest in the Partnership.  **(Exhibit A, p. 3, Section 5.1)**.  All profits and losses, and all items of gain, loss, deduction or credit would be shared by the Partners in accordance with their respective partnership interests.

28.     The Terms of the Agreement also state that "except as specifically provided in this Agreement or by applicable law, no Partner shall have the right to withdraw his or her contributions to the capital of the Partnership."  **(Exhibit A, p. 3; Section 5.3**)

29.     The partners agreed that the Partnership would pay to each partner a minimum yearly amount of at least $165,000, on a bi-weekly basis. Because he had put up capital for the Partnership, Plaintiff's bi-weekly payments for the period of January 1, 2021 through May 15, 2021 would be prorated into the bi-weekly payments beginning with the first payment after May 15, 2021 and continue until fully paid up; after which time, Plaintiff would receive to the standard bi-weekly payments.  **(Exhibit A, pp. 6-7; Section 6)**

30.     Plaintiff's initial contribution of $200,000 was to be returned when the Partnership had the funds fully available, and that in no event would it be returned later than December 31, 2024.  **(Exhibit A**, **p. 4; Section 6**).

31.     The Agreement permits the **Net Cash From Operations** to be distributed to the Partners in accordance with their respective Partnership Interests, "provided that no distribution of **Net Cash** shall be made at any time when any Installment of Purchase Price shall be due and owing but unpaid." **(Exhibit A, p. 4, Section 7.1)**.

32.     The Agreement states that: "Except as all of the Partners may otherwise agree in writing, all actions and decisions respecting the management, operation and control of the Partnership and its business (including without limitation the books and records and bank accounts and all other determinations referred to in this Agreement) may be taken or made with (and shall not be taken or made except with ) the consent and agreement of Partners having an aggregate Partnership Interests of not less than 100%." Thus neither Partner could spend or do anything with the funds of the Partnership without the express consent of the other Partner. **(Exhibit A, p. 5, Section 8.1).**

**33.**     The Agreement states that unless otherwise agreed to jointly by the Partners, and apart from reasonable out of pocket expenses incurred on the Partnership's behalf, "no Partner shall receive any salary or other compensation and/or benefit for services rendered to or for the Partnership." **(Exhibit A, p. 6, Section 9).**

**34.**     The Agreement states that "Legal title to the property of the Partnership shall be held in the name of 'First Health Pro Inc.'" or a similar name that the partners would determine, and that all of the property "shall be treated as Partnership Property subject to the terms of this Agreement." **(Exhibit A, p. 6, Section 10).**

35.     At first, and for some time thereafter, Plaintiff had no idea that Defendant Landau had created a fraudulent scheme to steal Plaintiff's money. Each time Defendant Landau came to Plaintiff to tell him he had a new account for him to fund, he constantly showed large amounts

of income coming into the Partnership's Chase bank accounts, which Plaintiff Katz had access to. Everything looked, on the record, as if Defendant Landau was properly running a medical staffing business that was generating substantial revenues. For this reason, Plaintiff Katz continued investing in the partnership.

36.     However, instead of using Plaintiff Katz's capital contributions to create and operate a medical staffing agency, as per the express terms of the Partnership Agreement, Defendant Landau was deceiving and defrauding Plaintiff all along, and using the funds for his own personal desires.

37.     Defendant Landau never used any of the funds Plaintiff Katz advanced for the purpose for which the Partnership had been founded. The vast majority of deposits that Defendant Landau made into the Company Bank accounts, which Plaintiff Katz had access to, were not revenue that the Company was earning, as Plaintiff Katz believed, but instead were deposits of funds from other investors whom Defendant Landau had also swindled in a Ponzi-type enterprise. Defendant Landau also transferred Partnership funds into other bank accounts which at the time Plaintiff Katz did not know existed. Once Plaintiff Katz realized Defendant Landau had been defrauding him, Plaintiff Katz discovered the existence of these bank accounts and downloaded all of the statements from them.

38.     In carrying out his fraudulent enterprise, Defendant Landau repeatedly lied to and deceived Plaintiff. But because of the continuing lies and deception, and the manipulative machinations Defendant Landau employed to hide his crimes from Plaintiff Katz, the fraud was concealed from Plaintiff Katz, and he therefore continued investing and advancing funds into the Partnership.

39.     In July of 2021, Defendant Landau induced Plaintiff to continue investing in the Company in a very elaborate and calculating way.  Defendant Landau actually went so far as to create an entirely fraudulent spreadsheet, a copy of which is attached hereto as **Exhibit B,** that he gave to Plaintiff in July of 2021, that purported to show to Plaintiff amounts coming in as revenue from ten (10) different medical facilities purportedly staffed by the Business as of July 27th, 2021.  This fraudulent spreadsheet purported to show that over **$1,269,817.67** had been paid as revenue to the Partnership from these ten (10) different medical facilities as of July 27, 2021.

40.     In doing this, Defendant Landau intended to deceive and did Plaintiff into believing that the income listed there was income earned by the Company for the purpose for which their Partnership was created - i.e. from providing medical staffing for all ten (10) of those facilities.  Defendant Landau never had any business relationship with any of these companies that was related to the Partnership.  The fraudulent spreadsheet purported to show Company revenue totaling **$1.269,817.67** as of July 21, 2021. Plaintiff saw this, and other spreadsheets as well, having no idea that these were not actually accounts receivable.

41.     Plaintiff Katz had no suspicions about Defendant Landau for many months because Landau made sure that everything came back into the Partnership's bank accounts - those accounts that Plaintiff Katz knew about - through the credit card processing company known as Square.  Business appeared to be booming, and the deception, carefully calculated and carried out by Defendant Landau, further induced Plaintiff Katz to continue investing each time Landau brought him a new account.

42.     At some point Plaintiff began to be suspicious. When this happened Defendant Landau became even more creative in his elaborate attempts to continue defrauding Plaintiff. Defendant created email addresses under fictitious names and aliases, including Jason Gold and

Henry Landau, from which he sent emails to himself, which he then shared with Plaintiff in order to further elaborately and fraudulently convince Plaintiff that he was running the business well and that funds were flowing into it from the purpose for which the Business and Partnership had been conceived.

43.     One such email, attached hereto as **Exhibit C,** was sent from Defendant Landau, who was pretending to be a person named Jason Gold, an employee of Cassena Care.  The email appeared to show that Jason Gold was sending a wire to Defendant Landau.  The text in the email, sent on November 5, 2022, states:   "Good Afternoon Henry, The Accounting team confirmed that the funds are with Chase bank so they just need to release the funds to your account. It's literally sitting at Chase bank right now.  Thank you, Jason Gold, Cassena Care, 225 Crossways Park Drive, Woodbury, New York, 11797".  Upon information and belief, Cassena Care is a real company that Defendant Landau has nothing to do with, but Defendant Landau faked being Jason Gold in sending emails to Plaintiff Katz in furtherance of his fraudulent inducement.

44.     Defendant Landau also sent multiple fake emails to himself, using the alias "Henry Landau" as an email recipient and alias "Eric Johnson" as the sender which he forwarded to Plaintiff Katz, in furtherance of his fraud.  He did this pretending to be Eric Johnson from the company Neogen, which is likely a real company, that also has nothing to do with Defendant Landau.  A copy of this email is attached hereto as **Exhibit C-1.**

45.     When Defendant Landau shared this fraudulently conceived email with Plaintiff, he did so in order to continue to convince Plaintiff that money was coming into the Partnership from medical facilities.  Plaintiff Katz would run to Chase Bank to retrieve the deposit and wait for hours, not understanding that Defendant Landau was cheating him in an elaborate enterprise.

Plaintiff Katz did this multiple times.  Sometimes funds would be transferred and sometimes not. Defendant Landau ultimately defrauded in or around twenty (20) other investors, apart from Plaintiff, of over $6 million, which he spent on prostitutes and gambling, in order to feed his personal addictions.

46.     Defendant Landau's fraudulent scheme went on for close to nine months, unbeknownst to Plaintiff, until Plaintiff had invested $1.3 million into the Company.  At some point cracks began to appear.  Plaintiff saw some red flags in the way that Defendant Landau was operating the accounts, and in the way he behaved when questioned about it.

47.     On one particular occasion, Plaintiff Katz looked at the Company accounts and saw that he had to pay between $300,000 and $400,000 over the next few days for payroll, and saw no money coming in.  At this same time when things started looking strange to Plaintiff, Defendant Landau also stopped checking in with him.

48.     Plaintiff Katz decided to check into the accounts and noticed a transfer of approximately $3,000 or $4,000 from one of the Partnership's bank accounts into another.  He questioned Landau, who said, "I owe you an explanation for that and we will talk tomorrow." The following morning Landau left a voicemail on Plaintiff's phone crying.  The two met to discuss the matter.

49.     On this occasion, Defendant Landau told Plaintiff that he had a gambling addiction and that he had some debt.  Plaintiff was sympathetic and told Defendant Landau that from now on, he was forbidden from withdrawing anything from the Partnership bank accounts. Landau agreed.

50.     Not long after this, Plaintiff saw a transfer -- this time of $90,000 between a Partnership account and a bank account in the name of a company called Laces Pro. According

to the Partnership agreement, either partner automatically becomes a part of any corporation that is associated with the Partnership. Laces Pro was a company belonging to Defendant Landau prior to the inception of the Partnership.

51.     When Plaintiff questioned Defendant Landau about the $90,000 transfer, at first Landau lied and said "Oh, I only meant to transfer $900 - that was an accident." At this point Plaintiff was certain that Landau was lying and made him transfer the $90,000 back into the Partnership bank account.

52.     In or around this time, one of Plaintiff's business associates, to whom Plaintiff had shared about the Partnership and how well it was doing, was prepared to invest $1.5 million into the Partnership. Fortunately for this associate, Plaintiff had discovered that Landau had been stealing from the Partnership bank accounts. He informed his associate not to give Landau or the Partnership one penny. Unfortunately for this associate, however, he had already loaned Landau $150,000.

53.     When Landau's fraud became clear, and Plaintiff Katz had lost all of his money and was unable to pay his bills and debts, Plaintiff Katz snapped. He realized he had been played for a fool for nearly a year. Prior to this he was a popular guy and very well liked in his community. His word was trusted. When Plaintiffs were no longer able to pay their bills they lost all of their money. The stress of this unimaginable scam was financially and emotionally devastating for both Plaintiffs, and was also physically damaging for Plaintiff Chaya Katz. Chaya Katz tried to find a therapist for Plaintiff Katz. Plaintiff Katz experienced chest pains due to the stress and had to take medication for anxiety

54.     Defendant Landau's scheme and treachery and the complicity with that scheme and treachery by the remaining Defendants had a devastating impact on both Plaintiffs. Plaintiff

Chaya Katz was severely injured. She lost her husband in the sense that he has never been the same person since Defendant Landau defrauded him. He is no longer able to trust anyone, sometimes even including his wife, as he used to before.

55. As a direct and proximate result of Defendant Landau's fraudulent acts and omissions with regard to the Partnership, and the stress and devastation caused to Plaintiffs, Plaintiff Chaya Katz developed four new auto-immune diseases, including Hashimoto's disease, insulin resistance, vitiligo and poly-cystic ovarian syndrome. She is also borderline diabetic and is continuously gaining weight that she is unable to lose, despite eating a balanced and healthy diet. These diseases have caused her immense emotional suffering because she used to be very beautiful, and they have impacted her appearance and life so much that she is ashamed to go outside the home and does not enjoy life as she used to do.

56. Plaintiff Katz does not work. On two separate occasions after Defendant Landau had stolen everything from him, he reached out to individuals in the community in an attempt to do business in real estate. But by this time, the entire community had heard about his difficulties with Defendant Landau and his financial circumstances, and would not do business with him once he told them his name. Plaintiff Katz also tried taking a job with a salary, but he was not able to work due to suffering from insomnia from the trauma and devastation caused by Defendant Landau.

57. Plaintiff Chaya Katz had to leave her job because she was not capable of working due to being too ill and not able to focus. She has chronic fatigue syndrome, low energy and sleeps during most of the daytime. She had been such a powerhouse at her previous job that after she left it took five (5) people to replace her.

58.     At the beginning of January, 2022, Chaya Katz tried to work as a photographer's assistant, doing office work.  But due to the stress of her life and the shame she experiences daily, she was not able to continue working.

59.     In addition to this Plaintiff Chaya Katz's illnesses and tiredness have negatively impacted her ability to care for the Plaintiffs' 5 year old son.  He suffers now, as his parents suffer, from the devastation wreaked by all of the Defendants.

60.     Plaintiffs have spent thousands of dollars, seeing many specialists and trying dozens of treatments for their medical and emotional issues, all of which have been directly and proximately caused by the acts and omissions of the Defendants, as described herein.  Despite all of their efforts and treatments tried, they continue to suffer.

61.     Their community completely ostracized them. Nobody will work with Plaintiff Katz, despite his asking them to do business with him.  The Plaintiffs are pariahs in their own community.

62.     Plaintiff Katz and Chaya Katz are only 26 and 24 years old, respectively.  What Defendants have done to them caused them and is still causing immense and severe emotional distress. It has destroyed their lives, by devastating their marriage, their lives as parents, their livelihoods, their ability to work, their health, their relationships, and their standing and reputation in the community in which they live.

63.     On November 18, 2021, Plaintiff Chaya Katz sent a text message to Defendant Landau, a copy of which is attached hereto as **Exhibit D.**  In this text, she tells Defendant Landau, "Thank you for taking away my husband & my life.  I will never be mochel on what you have done to us, there's a din & cheshben for everything you did."[1]  In response to this, Defendant Landau replied: "I know I'll pay a big price and i can't justify anything I did."

---

[1] Mochel is Hebrew for "forgiving'" din means "law" or "judgment" and cheshben means "self-accounting"

64.     In December of 2022, Plaintiff, along with two of his brothers and an individual who is a finance expert, confronted Defendant Landau in person and questioned him for approximately six hours about the fraud.  After denying everything he had done for six hours, Landau finally broke down weeping and admitted to everything.  He admitted to defrauding Plaintiff.  He confessed to his deeds, and to his deception, and apologized to Plaintiff for messing up Plaintiff's life.  His confessions are recorded on video and in audio voicemails that he left for Plaintiff Katz.

65.     In a text sent to Defendant Landau on December 29th, 2022, a copy of which is attached hereto as **Exhibit E,** Plaintiff wrote to Defendant Landau:  "Hi I'm just checking in on the 1.3 million you stole from me, is there any payment plan yet?  Running to Chaim Meir Hirsch that I'm messaging you won't help, unless he has a payment plan"

66.     To this text, Defendant Landau responded:

> Hi, I know I messed up pretty badly and i know I messed up your like [sic] as well.  Unfortunately, I am not in situation that I can make any large payments but my boss gave yankov ber payments of 2000 a month. I know it's not a lot but that is what I can do right now.  As time goes on iyh the amount will become more and more. I know it's not a lot to the big picture but I am working to make more to be able to pay more.

67.     To this text Plaintiff replied: "So I have to wait 55 years for you to complete the 1.3 million?"

68.     In another text message, a copy of which is attached hereto as **Exhibit F,** Plaintiff asks Defendant Landau, "Did you made even one freaking phone call for my money today?"  To which Defendant Landau replies, "Yes" and then states that he called "yaakov ber and my feter[2] moshe ber weiss."

---

[2] Feter is a Yiddish word meaning "Uncle"

69.     These text messages confirm that Defendant Landau sought and received shelter from his financial misdeeds with Defendant Hirsch, his new employer at Defendant Pro Med. Defendant Landau works at Pro Med under his wife's name, Defendant Etya Landau, in order that none of the other investors he defrauded can find him. Defendants Pro Med, Hirsch and Etya Landau all financially shelter and support Defendant Landau, and further assist him by hiding him away from his misdeeds that injured the Plaintiffs.

70.     As referenced above, Defendant Landau also sought and received financial shelter and support from from Defendant Rabbi Yaakov Ber, a friend of Defendant Landau's. Rabbi Yaakov Ber belongs to Defendant Satmar, which is the oldest Hasidic Dynasty located in New York City. Rabbi Yaakov Ber is the son of the Grand Rabbi of Satmar, Zalman Teitelbaum and it is widely considered that he will be the next Grand Rabbi of Satmar.

71.     After discovering what Landau had done, and needing help, Plaintiff Katz met with Rabbi Yaakov Ber. Prior to meeting, the two exchanged text messages. On November 23, 2022, Plaintiff Katz texted Yaakov Ber that Defendant Landau had stolen his last few dollars and that he had heard that Yaakov Ber was trying to help with the situation. He didn't receive any response until January 5, 2022. On that day Plaintiff Katz texted Rabbi Yaakov Ber, saying "I've been trying to reach you please let me know when is a good time for you to have a phone conversation. Thanks. To this text, Yaakov Ber responded, texting "K let's talk tomorrow." A copy of these text messages is attached hereto as **Exhibit G.**

72.     The two continued texting between January 6th 2022 and January 9th, 2022 agreeing to meet in person on January 10th, 2022 at 4 pm. A copy of these text messages is attached hereto as **Exhibit H.**

73.     On January 10, 2022, at 4:04 pm, Plaintiff Katz texted Defendant Yaakov Ber to say he he had arrived.  The two met to talk about what Defendant Landau had done and the effect upon Plaintiffs.  When they met, Plaintiff Katz told Yaakov Ber that he had a massive case for fraud against Landau.  Yaakov Ber laughed and told Plaintiff Katz that "worst case scenario you put a judgment on Landau . . . and it doesn't pay because you're not going to get any  money by doing that."  When Plaintiff Katz told Yaakov Ber about his family and his wife's new diseases, and how everything started for her from emotional pain, Yaakov Ber said "okay I'll look in and see how I can help you."

74.     But Yaakov Ber didn't mean any of this.  In a failed effort to try to make Plaintiff Katz feel good, Yaakov Ber then told Katz, "Cheskey has a miserable life now because I locked him in with a job and he can't even access the money because it goes straight to his wife, and I took away his car and gave it over to someone else."

75.     On January 11, 2022, Yaakov Ber sent Plaintiff Katz a text with the email address of Defendant Yaakov Ber in it: CongSiget@gmail.com Plaintiff Katz then tells yaakov Ber he sent (emailed) him a copy of the Partnership Agreement.  Cong Siget is the short form name of Defendant Cong Atzei.  A copy of the text messages from January 10th and January 11th, 2022, as described in the above paragraphs, is attached hereto as **Exhibit I.**

76.     On September 23, 2022, Plaintiff Katz received a Zelle deposit from Defendant Cong Atzei for $5,000, confirmation code RT0GGGJKC6 containing the subject line "Chesky Londo".  A copy of this money transfer is attached hereto as **Exhibit J.**

77.     On October 8, 2022, Plaintiff Katz received a Zelle deposit of funds from Defendant Cong Atzei for $1000, confirmation code RT0GLJQP6M, with the subject line "charity".  A copy of this money transfer is attached hereto as **Exhibit K.**

78.     Rabbi Yaakov Ber, who is the son of Zalman TEITELBAUM, the Grand Rabbi of Satmar, is widely believed to be the next Grand Rabbi of Satmar.  Grand Rabbi Zalman Teitelbaum was recently in the news for visiting a convicted child molester, Nechemya Weberman.  On December 16th, 2022 the Jewish News Week picked up the fact that Zalman Teitelbaum "spent over an hour with Weberman and offered words of faith and belief in God." The Jewish Week is a weekly independent community newspaper targeted towards the Jewish community of the metropolitan New York City area. The Jewish Week covers news relating to the Jewish community in NYC.  A copy of this article is attached hereto as **Exhibit L.**

79.     All of the foregoing indicates that Yaakov Ber, and Satmar are associated with the enterprise and are actively assisting Defendant Landau in evading liability for his deeds.  Further, it indicates that they are trying to buy off Plaintiff Katz and his wife.

80.     Prior to this, in April, 2022, Plaintiff Katz received two checks, one numbered 5786 and dated April 12, 2022, and the other dated April 15, 2022 and numbered 5788 from the parents of Defendant Etya Landau, Landau's wife. Each check was for $5,000.  Copies of these returned check are attached hereto as **Exhibits M and N.**

81.     The Plaintiff fulfilled all of his obligations under the Agreement. He continually invested his own personal funds into the Partnership, until he had directly invested $1.3 million. Defendant Landau fulfilled absolutely none of his obligations under the Agreement. Defendant Landau fraudulently induced Plaintiff to form a partnership and to invest his funds in it.  He then committed multiple acts of Fraud in order to Plaintiff from finding out what he had done with Plaintiff's investment in the Partnership.

82.     When it became clear that Defendant Landau's entire operation was fraudulent, and that Plaintiff would not be receiving any return on his investment, he had to borrow money

from in order to cover his payments. Plaintiff Katz borrowed approximately $800,000 from one friend during the last two months of chaos and confusion, prior to Landau's confessing everything to Plaintiff Katz.

83. In addition to this, in order to keep all of his businesses running, during 2022 Plaintiff borrowed over $11 million due to being defrauded by Defendant Landau.

84. The RICO Defendants have protected, shielded and assisted Defendant Landau and are continuing to assist Defendant Landau in advancing a scheme to defraud the Plaintiff of money that Defendant Landau took from him. They have sanctioned Landau's conduct and are profiting from it.

85. All Defendants have been unjustly enriched by the funds provided by Plaintiff.

86. Based on all of the foregoing, Plaintiffs now institute this action in this proper venue against all defendants seeking relief in the form of declaratory relief, compensatory damages, treble damages, interest, costs, and attorneys' fees.

## IV. <u>CAUSES OF ACTION</u>

### <u>FIRST CLAIM FOR RELIEF</u>

**(Violations of Federal Civil RICO—Conduct of a RICO Enterprise
18 U.S.C. § 1962(c) by all Defendants)**

87. Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

88. At all relevant times, each RICO Defendant was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c). The RICO Defendants violated 18 U.S.C. § 1962(c) by the acts described in the paragraphs below.

89. At all relevant times, the Ponzi scheme conceived and carried out by Defendant Landau, by which he defrauded Plaintiffs, constituted an "Enterprise" within the meaning of 18

U.S.C. §§ 1961(4) and 1962(c). At all relevant times, the RICO Defendants were engaged in, and/or their activities affected, interstate commerce and/or foreign commerce within the meaning of 18 U.S.C. § 1962(c).  At all relevant times, the remaining RICO Defendants held a position in or were otherwise affiliated with the Business described herein.

90.     At all relevant times the RICO Defendants did knowingly, willfully, and unlawfully conduct or participate, directly or indirectly, in the conduct, management, or operation of the affairs of the Business for which Plaintiffs have yet to be compensated.

91.     At all relevant times the RICO Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to advance their scheme to deceive or defraud Plaintiffs.

92.     The RICO Defendants have engaged in multiple predicate acts, as described herein. The conduct of the RICO Defendant as described herein constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), as they are both continuous and related.  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

93.     The RICO Defendants' violations of federal law as set forth herein, each of which directly and proximately injured Plaintiffs, constitutes a continuous course of conduct, which was intended to defraud Plaintiffs of money and property through false representations, fraud, deceit, and other improper and unlawful means. Therefore, said violations were a part of racketeering activity as defined by 18 U.S.C. §§ 1961(1) and (5).

94.     Plaintiffs were injured in their money and property by reason of the RICO Defendants' violation of 18 U.S.C. § 1962(c).  The RICO Defendants' injuries to Plaintiffs were a direct, proximate, and reasonably foreseeable result of their violation of 18 U.S.C. § 1962.

*Daskal v. Tyrnauer,* 961 N.Y.S 2d 357 [Sup Ct, Kings County 2012, *aff'd,* 123 AD3d 652, 998 NYS2d 412 [2d Dept 2014].

95.     Plaintiffs were injured by the RICO Defendants' (1) conduct; (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Invacare Supply Group, Inc. v. Star Promotions, Inc.,* 27 Misc 3d 1202 [A] [Sup Ct, Kings County 2010]; 18 USCA § 1962.

96.     Plaintiffs are the ultimate victims of the RICO Defendant's unlawful enterprises. Plaintiffs have been and will continue to be injured in their money and property in an amount to be determined at trial.

97.     As a direct and proximate result of the foregoing, Plaintiffs have been damaged and will be damaged in an amount exceeding $10 million.

98.     Pursuant to 18 U.S.C. § 1962(c), Plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from RICO Defendants as well as any other relief authorized by statute.

**SECOND CLAIM FOR RELIEF**
**(Fraud by Defendant Landau)**

99.     Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

100.     Under New York Law, to establish fraud a Plaintiff must prove five elements by clear and convincing evidence:  (1) a material misrepresentation or omission of fact; (2) made by defendant with knowledge of its falsity; (3) an intent to defraud; (4) reasonable reliance on the part of the Plaintiff; and (5) resulting damage to the Plaintiff.  *See Crigger v. Fahenstock & Co., Inc.* 443 F.3d 230, 234 (2d Cir. 2006).

101.     Defendant Landau approached Plaintiff Katz with the fraudulent scheme, inducing him to invest in the scheme.  He proceeded to take the funds that were invested in the

Partnership by Plaintiff Katz and use them as he saw fit and for his own purposes, never telling anything about this to Plaintiff Katz. Plaintiff Katz reasonably relied upon Defendant Landau's promises and the terms of the Partnership Agreement which Defendant Landau signed in investing $1.3 million into the Partnership.

102.    Defendant Landau's acts and omissions, as described herein, constitute common law fraud and he is liable for the damages his fraudulent conduct has cost the Plaintiffs.

103.    Plaintiff Katz has established through documentary evidence already presented in this Complaint, the five elements enumerated above.

104.    As a direct and proximate result of the foregoing, Plaintiffs have been damaged and will be damaged in an amount exceeding $10 million.

**THIRD CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty by Defendant Landau)**

105.    Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

106.    To state a claim for breach of fiduciary duties under New York Law, a plaintiff must establish: (1) the existence of a fiduciary relationship; (2) misconduct by the defendant; and (3) damages directly caused by the defendant's misconduct. *Murphy v. Morlitz,* 751 F. App'x 28, 30 (2d Cir. 2018).

107.    As set forth herein, Plaintiff Katz has established through documentary evidence submitted with this Complaint the three elements set forth above.

**108.**    As a direct and proximate result of the foregoing breach of fiduciary duty by Defendant Landau, Plaintiffs have been damaged and will be damaged in an amount exceeding $10 million.

## FOURTH CLAIM FOR RELIEF
### (Conversion by Defendant Landau)

109.    Plaintiffs incorporate by reference all of the preceding paragraphs of this Complaint as if fully set forth herein.

110.    New York law defines conversion as "the unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights." *Thyroff v. Nationwide Mut. Ins. Co.,* 460 F 3d. 400, 403-04 (2d Cir. 2006).

111.    Plaintiffs prove conversion by establishing four elements: (1) the property subject to conversion is a specific identifiable thing; (2) plaintiff had ownership, possession or control over the property before its conversion; and (3) defendant exercised an unauthorized dominion over the property, to the alteration of its condition or to the exclusion of the plaintiff's rights. *Moses v. Martin,* 360 F. Supp. 2d 533, 541 (S.D.N.Y. 2004).

112.    Plaintiff Katz has established that he invested $1.3 million into the Partnership - for the purpose for which the Partnership had been created.  Therefore it is a specific, identifiable thing - capital contribution.  Plaintiff Katz had ownership, possession and control over the property before Defendant Landau converted it.  Defendant Landau exercised an unauthorized dominion over the property to the alteration of its condition or to the exclusion of plaintiff's rights.

113.    Plaintiff Katz has clearly established that Defendant Landau acted without authorization in taking funds belonging to the Partnership; that he exercised a right of ownership over the property of the partnership and that he converted it and altered it to the exclusion of Plaintiff Katz' rights.

114.     As a direct and proximate result of the foregoing, Plaintiffs have been damaged and will be damaged in an amount exceeding $10 million.

## FIFTH CLAIM FOR RELIEF
### (Breach of Contract by Defendant Landau)

115.     Plaintiffs incorporate by reference all of the the preceding paragraphs of this Complaint as if fully set forth herein.

116.     In or around September of 2020, Plaintiff Katz and Defendant Landau entered into a Partnership and each agreed to fulfil their respective roles in that Partnership as described herein.

117.     Plaintiff Katz dutifully fulfilled his obligations under the Partnership Agreement by providing capital contributions of over $1.3 million, as well as performing all other obligations designated to him under the Agreement.

118.     Landau has failed to perform his duties and obligations under the Agreement, and has instead stolen, converted, spent or otherwise fraudulently transferred the funds for his own purposes that were provided by Plaintiff Katz for the Partnership.

119.     As a direct and proximate result of Defendant Landau's breach of the Partnership Agreement, Plaintiffs have been damaged and will be damaged in an amount to be proven at trial, but reasonably believed to exceed $10 million.

## SIX CLAIM FOR RELIEF
### (Fraudulent Inducement by Defendant Landau)

120.     Plaintiffs fully incorporate by reference all of the the preceding paragraphs of this Complaint as if fully set forth herein.

121.     Landau represented to Plaintiff Katz that he was experienced in the business of medical staffing and that it would be very lucrative for Plaintiff Katz to invest his money into a Partnership with him.

122.     In reliance upon Landau's false promises, lies, and fraudulent documentation, Plaintiff Katz invested considerable amounts of money into the Business.

123.     Upon information and belief, Landau had little to no experience in providing medical staffing needs to medical facilities.  Landau used the capital contributions provided by Plaintiff Katz to fund himself and his lifestyle and to enrich himself to Katz' detriment.

124.     Landau knowingly induced Plaintiff Katz to enter into the Partnership Agreement and to invest his personal funds without ever having  the intention of paying Plaintiffs what they are owed under the Agreement.  He misrepresented a material fact to Plaintiff Katz - regarding what he was doing with the Partnership funds -- knowing the same to be false.  He made the misrepresentation with the intention of inducing the Plaintiff Katz to rely upon it; Plaintiff Katz reasonably did rely upon it and this reliance caused injury to the Plaintiffs.

125.     Defendant Landau further induced Plaintiff Katz to continue investing by sharing fraudulent accounts receivable spreadsheets, as described herein.

126.     Plaintiff Katz relied on the false statements/representations, which were material to Plaintiff Katz' decision to enter into the Partnership, and to continue providing capital for the Partnership.

127.     As a direct and proximate result of the materially false statements made to Plaintiff Katz by Defendant Landau, on which Plaintiff Katz reasonably relied to his detriment, Plaintiffs have been damaged in an amount to be determined at trial, but reasonably believed to be in excess of $10 million plus interest, costs and attorneys fees.

128.     Plaintiffs are also entitled to an award of treble damages from Defendant Landau due to the wilful and wanton nature of the fraudulent inducement.

### SEVENTH CAUSE OF ACTION
**(Negligent Misrepresentation Against Defendant Landau)**

129.     Plaintiffs fully incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

130.     To state a claim for negligent misrepresentation under New York law, the plaintiff must prove: (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment. *Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir. 2000).

131.     Defendant Landau had a duty, by virtue of being a Partner to Plaintiff Katz - a special relationship, to give Plaintiff Katz correct information.  Landau made multiple false representations for nearly a year that he knew or should have known were incorrect.  Landau knew that the information he  supplied was desired by Plaintiff Katz for a serious purpose and that Plaintiff Katz would relay and act upon it.  And Plaintiff Katz relied upon it to his detriment.

132.     At all relevant times Landau represented that additional capital was needed to fund the Partnership's Business. He did so knowing that it was he himself who needed money and that he was going to divert the Plaintiff's investment for his own purposes.  Defendant Landau intended for Plaintiff Katz to rely upon his false and misleading representations.

133.     In reliance upon the misrepresentations by Landau, Plaintiff Katz provided capital contributions totaling over $1.3 million to fund First Health Pro, Inc.

134.     In order to raise additional capital, Plaintiff Katz solicited family members and friends in order to get them to invest as well.

135.     Defendant Landau diverted these funds to his own accounts and depleted the Business's bank accounts.   Plaintiff Katz has demanded that these funds be returned and Defendant Landau has failed and refused to return Plaintiff's Katz's funds.

136.     As a result of Landau's negligent misrepresentations to get Katz to provide additional capital contributions, Plaintiffs have been damaged in an amount to be proven at trial.

<u>**EIGHTH CLAIM FOR RELIEF**</u>
**(Aiding and Abetting Fraud by Remaining Defendants)**

137.     Plaintiffs fully incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

138.     Under New York Law, to establish aiding and abetting fraud, a plaintiff must prove: (1) the existence of a primary violation; (2) actual knowledge of the violation by the aider and abettor; and (3) substantial assistance. *Kirschner v. Bennett,* 648 F. Supp. 2d 525, 533 (S.D.N.Y. 2009) .

139.     As discussed above, Plaintiff Katz has established fraud against Defendant Landau.   Plaintiff Katz has also established, through documentary evidence attached to this Complaint as Exhibits, that each of the remaining Defendants played a role and is still playing a role in assisting him with that Fraud.

140.     Plaintiff Katz has therefore established that the remaining Defendants all aided and abetted, and are still aiding and abetting Defendant Landau with the fraud which he perpetrated against the Plaintiffs.

141.    As a direct and proximate result of the aiding and abetting of fraud by the remaining Defendants, Plaintiff have been damaged and will be damaged in an amount exceeding $10 million.

## NINTH CLAIM FOR RELIEF
### (Unjust Enrichment by All Defendants)

142.    Plaintiffs fully incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

143.    Cases dealing with unjust enrichment in New York are uniform in their recognition of three elements of the claim: (1) that the defendant benefited; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution. *Beth Israel Med. Ct., v. Horizon Blue Cross & Blue Shield of N.J., Inc.,* 448 F.3d 573, 586 (2d Cir. 2006) .

144.    In reliance upon Landau's false promises, his fraudulent displays of accounts receivable, and his fraudulent display of emails regarding medical facilities sending funds to the Partnership bank accounts, Plaintiff Katz made considerable investments of money into the partnership.

145.    Defendant Landau kept for himself, misused and wrongfully transferred assets of the Partnership, which had been funded by Plaintiff Katz. Because of this Defendant Landau has been unjustly enriched at Plaintiffs' expense.

146.    As aiders and abetters to Defendant Landau's fraud, all Defendants have been materially enriched by the capital contributions provided by the Plaintiffs to the Partnership, which were illegally diverted to Defendant Landau, as set forth herein, and for which Plaintiffs have not received payment. Therefore all Defendants have been materially enriched at the Plaintiffs' expense.

147.     It is against equity and good conscience to permit the Defendants to retain what is sought to be recovered.

148.     As a direct and proximate result of the acts and omissions of all of the Defendants, Plaintiffs have been damaged and will be damaged in an amount to be proved at trial, but reasonably believed to be in excess of $10 million.

## TENTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

149.     Plaintiffs fully incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

150.     Under New York law, a party who has been subjected to "conduct . . . so outrageous in character, and so extreme in damages, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" is entitled to prove a claim for intentional infliction of emotional distress." *Murphy v. Am. Home Products Corp.,* 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 236 (1983).

151.     To recover damages for intentional infliction of emotional distress, a plaintiff must establish four distinct elements, including (1) extreme and outrageous conduct; (2) intent to cause, or disregard of a substantial probability of causing severe emotional distress; (3) severe emotional distress; and (4) a causal connection between the conduct and a cognizable injury. *Howell v. New York Post Co., Inc.,* 81  N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353 (1993).

152.     Defendant Landau's actions were extreme and outrageous and either designed to, or in complete and utter disregard of the probability of causing severe emotional distress in Plaintiff Katz and his wife, Plaintiff Chaya Katz.  Both Plaintiffs have suffered severe emotional stress and distress and damages resulting from the acts and omissions of Defendant Landau, as well as all other defendants who have aided and abetted him. There is no doubt that the acts and

omissions of all the defendants are causally connected to the distress suffered by Plaintiff Katz and his wife, Plaintiff Chaya Katz.

153.    An award of punitive damages is intended to advance the important state interests of deterrence and retribution. *State Farm Mut. Auto Ins. Co. v. Campbell,* 538 U.S. 408, 416, 123 S. Ct. 1513, 1519 (2003). The factors to be considered when awarding punitive damages include: (1) the degree of reprehensibility of the tortious conduct; (2) the ratio of punitive damages to compensatory damages; and (3) the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *Lee v. Edwards,* 101 F.3d 805, 809 (2d Cir. 1996).

154.    Punitive damages, or exemplary damages, are damages assessed to punish the Defendants for outrageous conduct similar to that which formed the basis of the lawsuit.

155.    Plaintiffs Katz and his wife, Plaintiff Chaya Katz are entitled to actual and punitive damages based on the outrageous, intentional, willful and wanton acts of the Defendants, as described in this Complaint.

## ELEVENTH CAUSE OF ACTION
### (Payment of Attorneys Fees By All Defendants)

156.    Plaintiffs fully incorporate by reference the preceding paragraphs of this Complaint as if fully set forth herein.

157.    The acts and omissions by all of the Defendants as set forth herein were willful and wanton and they harmed Plaintiffs.

158.    As a result of all Defendants' acts and omissions, as described herein, Plaintiffs were forced to initiate this proceeding.

159.    Plaintiffs therefore have a right to attorneys' fees and costs for having to initiate and litigate this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1.      As to the First Cause of Action, award Plaintiffs money damages pursuant to 18 U.S.C. § 1962(c), as well as treble damages plus costs and attorneys' fees, and any other relief provided by the statute for the violations of the RICO statutes by all defendants.

2.      Enter judgment against the RICO Defendant in an amount equal to three times the amount of damages to the the Plaintiffs have sustained because of the RICO Defendant's actions, plus a civil penalty for each violation of 18 U.S.C. § 1964;

3.      Order the RICO Defendant to cease and desist from violating 18 U.S.C. § 1964;

4.      As to the Second Cause of Action, award Plaintiff Katz money damages caused by the fraud committed by Defendant Landau.

5.      As to the Third Cause of Action, award Plaintiff Katz money damages for the breach of fiduciary duty committed by Defendant Landau.

6.      As to the Fourth Cause of Action, award Plaintiff Katz money damages for the conversion of assets by Defendant Landau.

7.      As to the Fifth Cause of Action, award Plaintiff Katz money damages for Defendant Landau's breaching the Partnership Agreement he had with Plaintiff Katz.

8.      As to the Sixth Cause of Action, award Plaintiff Katz money damages, plus treble damages for Defendant Landau's acts and omissions that constitute fraudulent inducement.

9.      As to the Seventh Cause of Action, award Plaintiff Katz money damages for the negligent misrepresentations by Defendant Landau.

10.     As to the Eighth Cause of Action, award both Plaintiffs money damages for the aiding and abetting of fraud committed by the remaining Defendants, apart from Defendant Landau.

11.     As to the Ninth Cause of Action, award both Plaintiffs money damages for the unjust enrichment, to be paid jointly and severally by all defendants.

12.     As to the Tenth Cause of Action, award both Plaintiffs money damages for the intentional infliction of emotional distress caused by the acts and omissions of all Defendants.

13.     As to the Eleventh Cause of Action, award Plaintiffs Attorneys Fees and costs of this action to be paid by all defendants.

14.     An award of Restitution to Plaintiffs of all money, property and benefits Plaintiffs were unlawfully defrauded and deprived of by the RICO Defendant; and

15.     Grant to Plaintiffs such other and further relief as this Court may deem just and proper.


Dated: New York, New York
       January 11, 2023


By _____
    Scott Levenson, Esq.
    LEVENSON LAW GROUP
    Attorney for Plaintiffs
    625 West 51st Street
    New York, New York 10019
    Tel. (212) 957-9200
    Fax (201) 638-4822
    Email: slevensonesq@gmail.com

TO: