## ARTICLES OF PARTNERSHIP OF FIRST HEALTH PRO INC.

### W I T N E S S E T H :

WHEREAS the parties hereto desire to form a partnership pursuant to the laws of the State of New York for the purposes hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants set forth herein and other valuable consideration, the receipt and sufficiency of which hereby are acknowledged, the Partners agree as follows:

### Definitions

As used in this Agreement the terms listed below will have the meanings stated below, and other terms defined elsewhere will have the meanings there ascribed to them:

"Agreement" or "this Agreement":  these Articles of Partnership.

"Bankruptcy":  with respect to any Person, shall mean that such Person shall have become insolvent or generally failed to pay, or admitted in writing his or its inability to pay, debts as they become due; or shall have applied for, consented to, or acquiesced in the appointment of, a trustee, receiver or other custodian for such Person or any property of such Person, or such Person makes a general assignment for the benefit of creditors; or, in the absence of such application, consent or acquiescence, a trustee, receiver or other custodian is appointed for such Person or for a substantial part of the property of such Person and is not discharged with sixty days; or any bankruptcy, reorganization, debt arrangement, or other case or proceeding under any bankruptcy or insolvency law, or any dissolution or liquidation proceeding is commenced in respect of such Person and if such case or proceeding is not commenced by such Person, it is consented to or acquiesced in by such Person or remains for sixty days undismissed; or such Person takes any action to authorize, or in furtherance of, any of the foregoing.

"Partner":  each or any of the parties hereto and any other Person or entity that may hereafter become a partner of this Partnership pursuant to the terms of this Agreement.

"Partnership": the general partnership formed under and pursuant to this Agreement.

"Person":  a natural person, partnership, corporation, unincorporated association, trust, estate or any other entity.

"Retirement":  the determination of a Partner, of which notice shall have been given to all other Partners, no longer to continue as a Partner.

## Section 1

## NAME

The name of the Partnership shall be "First Health Pro Inc."

## Section 2

## PRINCIPAL PLACE OF BUSINESS

The Partnership's principal office and place of business (the "Office") shall be 8 Harrison Avenue Brooklyn, NY 11211.

The Partnership shall have such other or additional offices as the Partners may from time to time designate in accordance with this Agreement.

## Section 3

## BUSINESS AND PURPOSE

3.1.     The Partnership's business and purpose is a medical staffing agency and to engage in any other business that the Partners, acting in accordance with Section 8 of this Agreement, shall determine.

3.2.     The Partnership shall have authority and power to engage in any other activities necessary to conduct the business described in Section 3.1 including, by way of illustration and not limitation, arranging for and delivering contracts of sale, deeds, leases, deeds of trust, ground leases, mortgages, notes and other evidence of indebtedness, security agreements, and other security instruments; entering into agreements for the construction, design and management of improvements; and doing all things reasonably incident to the specialization in top quality garage doors, openers, gates, and garage door repair services

## Section 4

## TERM

The Partnership shall commence on (or commenced on) January 1, 2021 and, unless sooner terminated in accordance with this Agreement, shall continue indefinitely.

## Section 5
## CAPITAL CONTRIBUTIONS

5.1.     The initial capital contribution of each Partner to the Partnership is in the amount set forth below after his or her name:

| Name of Partner | Amount of Initial Contribution |
|---|---|
| Cheskel Landau ("Landau") | NA |
| Joseph Katz ("Katz") | $200,000.00 |

Katz has already funded $75,000.00 to the Partnership and will fund another $55,000.00 to the Partnership upon the execution of this Agreement and will fund another $70,000.00 six (6) weeks after the execution of this Agreement.

5.2.    An individual capital account shall be maintained for each Partner and shall consist of his or her initial capital contribution, increased by (a) additional capital contributions made by him or her and (b) his or her share of Partnership profits and gains, and decreased by (i) distributions of profits and capital to him or her and (ii) his or her share of Partnership losses, deductions and credits, and otherwise in accordance with generally accepted accounting principles.

5.3.    Except as specifically provided in this Agreement or by applicable law, no Partner shall have the right to withdraw his or her contributions to the capital of the Partnership.

**Section 6**

**PARTNERSHIP INTERESTS**

6.1.    Each Partner's interest in the Partnership (his or her **"Partnership Interest"**) shall be as follows:

| Name of Partner | Partnership Interest |
|---|---|
| Cheskel Landau | 60% |
| Joseph Katz ("Katz") | 40% |
| Total | 100% |

6.2.    All profits and losses, and all items of income, gain, loss, deduction or credit, shall be shared by the Partners in accordance with their respective Partnership Interests.

6.3.    Unless the Partners agree otherwise, the Partnership shall pay a minimum per

annum of at least $165,000.00 to Landau and shall pay a minimum per annum of at least $165,000.00 to Katz. Such payments shall be made bi-weekly (the "bi-weekly payments"). Katz's bi-weekly payments for the period of January 1, 2021 through May 15, 2021 shall be prorated into the bi-weekly payments beginning with the first payment after May 15, 2021 and shall continue until fully paid up. Thereafter Katz shall return to the standard bi-weekly payments.

6.4    Katz's initial contribution of $200,000.00 shall be returned when the Partnership has the funds fully available, and the Parties agree to such distribution. In no event shall the Partnership pay back to Katz his initial contribution later than the fourth (4) year anniversary of the date of this Agreement. To be clear such shall be paid by December 31, 2024.

## Section 7

## DISTRIBUTION OF PROFITS

7.1.    The Net Cash From Operations (as defined in Section 7.2) of the Partnership shall be distributed to the Partners in accordance with their respective Partnership Interests at such regular time or times as the Partners acting in accordance with Section 8 shall determine; provided that no distribution of Net Cash From Operations shall be made at any time when any Installment of Purchase Price (as defined in Section 19) shall be due and owing but unpaid.

7.2.    As used in this Section 7, the term "Net Cash From Operations" means, with respect to any period in time:

7.2.1.    The taxable income of the Partnership for federal income tax purposes as shown on the books of the Partnership for such period, increased by:

(a)    the depreciation and amortization deductions taken in computing such taxable income, and

(b)    any non-taxable income or receipts of the Partnership for such period, reduced by:

(i)    payments made during such period of principal of any indebtedness of the Partnership for borrowed money, and

(ii)    such expenditures and reserves for capital improvements or replacements, repairs, other anticipated expenses and working capital needs as the Partners, acting in accordance with Section 8, shall deem reasonably necessary for the conduct of the business;

*plus:*

7.2.2.    Any other funds (including without limitation amounts earlier set aside for reserves but no longer deemed necessary for such purpose) deemed available for the

4

distribution by the Partners acting in accordance with Section 8.

7.3.    In addition to regular distributions made pursuant to Section 7.1, upon any sale, transfer or other disposition of any capital asset of the Partnership (hereinafter referred to as a "Disposition"), the proceeds of such Disposition net of selling or other expenses and the repayment of indebtedness secured by the asset subject to the Disposition (the "**Net Proceeds**") shall be retained by the Partnership or be distributed to the Partners in proportion to their respective Partnership Interests, all as the Partners acting in accordance with Section 8 shall determine.

**Section 8**

**<u>MANAGEMENT OF THE PARTNERSHIP</u>**

8.1.    Except as all of the Partners may otherwise agree in writing, all actions and decisions respecting the management, operation and control of the Partnership and its business (including without limitation the books and records and bank accounts and all other determinations referred to in this Agreement) may be taken or made with (and shall not be taken or made except with) the consent and agreement of Partners having aggregate Partnership Interests of not less than 100%.

8.2.    Landau shall handle the day-to-day operations of the Partnership. Such shall include but is in no way meant to limit: hiring and firing employees, general office management, opening accounts, maintaining accounts, collections, and anything else required by the Partnership to perform its business.

8.3.    Katz shall handle the financials of the Partnership including bookkeeping, accounting and raising capital. Katz shall have access to all of the Partnerships books and records, bank information, and logins. Katz shall also fund the Partnership on an as needed basis as agreed to by the Partners, or by his own decision through personal capital, loans, lines of credit, credit cards, or personal loans.

8.4    Each Partner shall devote to the business of the Partnership so much of his or her time as shall in such Partner's sole judgment be reasonably necessary for the efficient operation of the business.

8.5    Each of the Partners shall have authority to execute instruments on behalf of the Partnership.

8.6    Nothing contained in this Agreement shall be deemed to constitute any Partner the agent of another Partner or to limit the Partners in the carrying on of their separate respective business activities. Without limiting the foregoing it is expressly recited that any Partner may engage in and possess any interest in any business or venture other than the business of the Partnership, independently or with other persons, and whether or not directly or indirectly in competition with the business of the Partnership, and neither the Partnership nor any other Partner shall have any rights by virtue of this Agreement to any such independent business or the

income or profits derived therefrom.

### Section 9

### SALARIES AND BENEFITS

Unless otherwise agreed by the Partners acting in accordance with Section 8 of this Agreement, no Partner shall receive any salary or other compensation and/ or benefit (except for reimbursement of reasonable out-of-pocket expenses incurred on the Partnership's behalf) for services rendered to or for the Partnership.

### Section 10

### LEGAL TITLE TO PARTNERSHIP PROPERTY

Legal title to the property of the Partnership shall be held in the name of "First Health Pro Inc." or in such other name or manner as the Partners acting in accordance with Section 8 shall determine. It is contemplated that the Partners may agree to have title to Partnership Property taken and held in their own names or in the names of trustees or nominees for the Partnership, but such manner of holding title shall be solely for the convenience of the Partnership and all such property shall be treated as Partnership Property subject to the terms of this Agreement.

### Section 11

### BANKING

All revenues of the Partnership shall be deposited regularly in Partnership savings, checking or similar accounts in the name of the Partnership at such bank or banks as shall be selected by the Partners acting in accordance with Section 8, and the signatures of such Partners as shall be determined in accordance with Section 8 shall be designated to be honored for all banking purposes. Each partner shall have full access to all books, records and bank accounts of the Partnership.

### Section 12

### BOOKS; FISCAL YEAR; AUDITS

Accurate and complete books of account shall be kept by the Partners and entries promptly made therein of all of the transactions of the Partnership, and such books of account shall be open at all times to the inspection and examination of the Partners. The fiscal year of the Partnership shall be the calendar year. A compilation, review or audit of the financial affairs and

position of the Partnership, as determined by the Partners acting in accordance with Section 8, shall be made as of the close of each fiscal year of the Partnership by independent public accountants selected by the Partners acting in accordance with Section 8.

At all times during the continuance of the Partnership, the Partners shall keep or cause to be kept complete and accurate records and books of account in which shall be entered each transaction of the Partnership in accordance with generally accepted accounting principles.

The Partnership shall furnish to each Partner, within seventy-five days after the end of each fiscal year, an annual report of the Partnership which shall include a balance sheet as of the end of such fiscal year; a profit and loss statement of the Partnership for such fiscal year; a statement of the balance in the capital account of such Partner; and the amount of such Partner's share of the Partnership's income, gain, losses, deductions and other relevant items for federal income tax purposes.

The Partnership shall prepare or cause to be prepared all federal, state and local income tax and information returns for the Partnership, and shall cause such tax and information returns to be filed timely with the appropriate governmental authorities.  Within seventy-five days after the end of each fiscal year, the Partnership shall forward to each person who was a Partner during the preceding fiscal year a true copy of the Partnership's information return filed with the Internal Revenue Service for the preceding fiscal year.

All elections required or permitted to be made by the Partnership under the Internal Revenue Code, and the designation of a tax matters partner pursuant to Section 6231(a)(7) of the Internal Revenue Code for all purposes permitted or required by the Code, shall be made by the Partnership by the unanimous vote or consent of the Partners.  The tax matters partner shall take such action as may be necessary to cause each other Partner to become a notice partner within the meaning of Section 6223 of the Code.  The tax matters partner may not take any action contemplated by Sections 6222 through 6232 of the Code without the consent of the Partnership by the unanimous vote or consent of the Partners.

All such records, books of account, tax and information returns, and reports and statements, together with executed copies of this Agreement, shall at all times be maintained at the principal place of business of the Partnership, and shall be open to the inspection and examination of the Partners or their duly authorized representatives during regular business hours.  Each Partner, or a duly authorized representative of such Partner, may make copies of the Partnership's books of account and records at the expense of such Partner.  Any Partner, at the expense of such Partner, may conduct an audit of the Partnership's books of account and records.

The cost of preparing all of the aforesaid records, books, returns and other items shall be borne by the Partnership.  Upon request of the Partnership, the Partners shall pay to the Partnership, in proportion to the Partners' Percentage Interests, the cost of preparing same, not to exceed in the aggregate $2,000 for each fiscal year.

**Section 13**

**TRANSFER OF PARTNERSHIP INTEREST
AND PARTNERSHIP RIGHTS**

Except as otherwise provided in Sections 14, 15 and 16 hereof, no Partner (hereinafter referred to as the "Offering Partner") shall, during the term of the Partnership, sell, hypothecate, pledge, assign or otherwise transfer with or without consideration (hereinafter collectively referred to as a "Transfer") any part or all of his or her Partnership Interest to any other person (a "Transferee"), without first offering (hereinafter referred to as the "Offer") that portion of his or her Partnership Interest subject to the contemplated transfer (hereinafter referred to as the "Offered Interest") first to the Partnership and then to the other Partners, at a purchase price (hereinafter referred to as the "Transfer Purchase Price") and in a manner as follows:

13.1.    The Transfer Purchase Price shall be the Appraised Value (as defined in Section 18.1).

13.1.1. The Offer shall be made by the Offering Partner first to the Partnership by written notice (hereinafter referred to as the "Offering Notice"). Within twenty days (hereinafter referred to as the "Partnership Offer Period") after receipt by the Partnership of the Offering Notice, the Partnership shall notify the Offering Partner in writing (hereinafter referred to as the "Partnership Notice"), whether or not the Partnership shall accept the Offer and shall purchase all but not less than all of the Offered Interest. If the Partnership accepts the Offer to purchase the Offered Interest, the Partnership Notice shall fix a closing date not more than twenty-five days (hereinafter referred to as the "Partnership Closing Date") after the expiration of the Partnership Offer Period.

13.1.2. If the Partnership decides not to accept the Offer, the Offering Partner or the Partnership, at his or her or its election, shall, by written notice (hereinafter referred to as the "Remaining Partner Notice") given within the period (hereinafter referred to as the "Partner Offer Period") ending ten days after the expiration of the Partnership Offer Period, make the Offer of the Offered Interest to the other Partners, each of whom shall then have a period of twenty-five days (the "Partner Acceptance Period") after the expiration of the Partner Offer Period within which to notify in writing the Offering Partner whether or not he or she intends to purchase all but not less than all of the Offered Interest. If two or more Partners of the Partnership wish to accept the Offer to purchase the Offered Interest, then, in the absence of an agreement otherwise between them, such Partners shall have the right to purchase the Offered Interest in the proportion which their respective Partnership Interests bear to the Partnership Interests of all of the Partners who wish to accept the Offer. If the other Partners intend to accept the Offer and to purchase the Offered Interest, the written notice required to be given by them shall fix a closing date not more than twenty-five days after the expiration of the Partner Acceptance Period (hereinafter referred to as the "Partner Closing Date").

13.2.    The aggregate dollar amount of the Transfer Purchase Price shall be payable in cash on the Partnership Closing Date or on the Partner Closing Date, as the case may be, unless

the Partnership or the purchasing Partners shall elect prior to or on the Partnership Closing Date or the Partner Closing Date, as the case may be, to purchase such Offered Interest in installments pursuant to the provisions of Section 19 hereof.

13.3.   If the Partnership or the other Partners do not accept the Offer or, if the Offer is accepted by the Partnership or the other Partners and the Partnership or the other Partners fail to purchase all of the Offered Interest at the Transfer Purchase Price within the time and in the manner specified in this Section 13, then the Offering Partner shall be free, for a period (hereinafter referred to as the "Free Transfer Period") of sixty days from the occurrence of such failure, to transfer the Offered Interest to a Transferee; subject only to any additional restrictions on such Transfer that may be imposed by this Agreement or any other agreement. Any such Transferee, upon acquiring the Offered Interest, shall automatically be bound by the terms of this Agreement and shall be required to join in, execute, acknowledge, seal and deliver a copy of this Agreement as a result of which he shall become an additional party hereto. If the Offering Partner shall not transfer the Offered Interest within the Free Transfer Period, his right to transfer the Offered Interest free of the foregoing restrictions shall thereupon cease and terminate.

13.4.   No transfer made pursuant to this Section 13 shall dissolve or terminate the Partnership or cause the Partnership to be wound up, but, instead, the business of the Partnership shall be continued as though such Transfer had not occurred.

## Section 14

## <u>PURCHASE ON DEATH</u>

14.1.   Upon the death of any Partner (hereinafter referred to as the "Decedent") the Partnership shall neither be terminated nor wound up but, instead, the business of the Partnership shall be continued as if such death had not occurred. Each Partner shall have the right by testamentary disposition to bequeath all or any portion of his or her Partnership Interest in the Partnership to a member of his or her immediate family (as defined in Section 21) or to any trust in which any one or more members of his or her immediate family (as defined in Section 21) retain the full beneficial interest; provided that in the case of any such bequest, the legatee or legatees shall hold the Partnership Interest received as a result of such bequest subject to the terms of this Agreement and shall be required to join in and execute, acknowledge, seal and deliver a copy of this Agreement as an additional Partner party hereto.

(a)   all or any portion of the Partnership Interest owned by a Decedent at the time of his or her death shall not be bequeathed by testamentary disposition or shall be bequeathed to one or more persons other than persons to whom such a bequest is permitted under the foregoing provisions of this Section 14.1; or

(b)   all or any portion of the Partnership Interest owned by a Decedent at the time of his or her death shall be bequeathed by testamentary disposition to one or more persons (collectively, the "Heir") to whom such a bequest is permitted under the foregoing provisions of this Section 14.1, and (i) the Heir shall notify the Partnership in

writing within six months of the date of death of the Decedent that the Heir desires to sell to the Partnership the said Partnership Interest so bequeathed to the Heir or (ii) the Heir shall die (hereinafter all or any portion of the Partnership Interest referred to in Section 14. l(a) and (b) shall be collectively referred to as the "Decedent Interest"), then the Partnership shall purchase and the Decedent's personal representatives, the Heir, or the personal representatives of the Heir, as the case may be, shall sell the Decedent Interest to the Partnership in such event. The Partnership shall, by written notice addressed to the Decedent's personal representatives, the Heir, or the personal representatives of the Heir, as the case may be, fix a closing date for such purchase; the closing date shall not be less than sixty (60) days after the appointment of such personal representatives, but in no event longer than one year after the date of death of the Decedent or of the Heir, as the case may be. The Partnership shall purchase the Decedent Interest on the closing date at a price (hereinafter referred to as the "Decedent Purchase Price") which shall be the Appraised Value (as defined in Section 18.1).

14.2.   The aggregate dollar amount of the Decedent Purchase Price shall be payable in cash on the closing date, unless the Partnership shall elect prior to or on the closing date to purchase the Decedent Interest in installments as provided in Section 19 hereof.

## Section 15

## <u>PURCHASE UPON BANKRUPTCY OR RETIREMENT</u>

15.1.   Upon the Bankruptcy or Retirement from the Partnership of any Partner (the "Withdrawing Partner"), the Partnership shall not be terminated nor wound up, but, instead, the business of the Partnership shall be continued as if such Bankruptcy or Retirement, as the case may be, had not occurred, and the Partnership shall purchase and the Withdrawing Partner shall sell all of the Partnership Interest and Partnership Rights (the "Withdrawing Partner's Interest") owned by the Withdrawing Partner in the Partnership on the date of such Bankruptcy or Retirement (the "Withdrawal Date"). The Partnership shall, by written notice addressed to the Withdrawing Partner or to the legal representative of a bankrupt Partner, fix a closing date for such purchase which shall be not less than sixty (60) days after the Withdrawal Date. The Withdrawing Partner's Interest shall be purchased by the Partnership on such closing date at a price (the "Withdrawing Purchase Price") which shall be the Appraised Value (as defined in Section 18.1 of this Agreement).

15.2.   The aggregate dollar amount of the Withdrawing Purchase Price shall be payable in cash on the closing date, unless the Partnership shall elect prior to or on the closing date to purchase the Withdrawing Partner's Interest in installments as provided in Section 19 of this Agreement.

**Section 16**

**CERTAIN FURTHER EVENTS GIVING
RIGHT TO PURCHASE OPTION**

16.1.   If any Partner (the "Defaulting Partner"):

(a)     shall have filed against him or her any tax lien respecting all or substantially all of his or her property and such tax lien shall not be discharged, removed or provided for in full by bond within ^ days of the date on which it was filed; or

(b)     shall subject his or her Partnership Interest or any part thereof or interest therein or his or her Partnership Interest or any part thereof or interest therein shall otherwise be made or become subject to a judgment lien, a charging order or similar charge or encumbrance entered by any court of competent jurisdiction, then, immediately upon the occurrence of either of said events (the "Occurrence Date"), the Partnership shall have the right and option, exercisable by written notice to the Defaulting Partners, within sixty (60) days of the Occurrence Date, to purchase from the Defaulting Partner, who shall sell to the Partnership, all of the Partnership Interest (the "Defaulting Partner's Interest") owned by the Defaulting Partner in the Partnership on the Occurrence Date. The Partnership shall, by written notice delivered to the Defaulting Partner or his successors, fix a closing date for such purchase which shall be not less than ^ days after the Occurrence Date. The Defaulting Partner's Interest shall be purchased by the Partnership on such closing date at a price (the "Defaulting Partner's Purchase Price") which shall be the Appraised Value (as defined in Section 18.1 of this Agreement).

16.2.   The aggregate dollar amount of the Defaulting Partner's Purchase Price shall be payable in cash on the closing date, unless the Partnership shall elect prior to or on the closing date to purchase the Defaulting Partner's Interest in installments as provided in Section 19 of this Agreement.

**Section 17**

**CERTAIN TAX MATTERS**

It is the intention of the parties that the Transfer Purchase Price, the Decedent Purchase Price, the Withdrawing Purchase Price and the Defaulting Partner's Purchase Price shall constitute and be considered as made in exchange for the interest of the retired Partner in Partnership Property, including good will, within the meaning of Section 736(b) of the Internal Revenue Code of 1986, as amended.

## Section 18

## THE APPRAISED VALUE

18.1.   The term "Appraised Value" as used in this Agreement shall mean a dollar amount equal to the product obtained by multiplying (a) the percentage Partnership Interest in question, expressed as a decimal, by (b) the Fair Market Value of the Partnership's assets as determined in accordance with Section 18.2.

18.2.   The Fair Market Value of the Partnership's assets shall be determined in the following manner:

18.2.1. Within sixty (60) days of the Offering Notice, date of death of a Decedent, Withdrawal Date or Occurrence Date, as the case may be, the remaining Partners shall select an appraiser (the "Partnership Appraiser") to determine the Fair Market Value of the Partnership's assets, and the Partnership Appraiser shall submit his determination thereof within sixty (60) days after the date of his selection (the "Appraisal Due Date").

18.2.2. If the appraisal made by the Partnership Appraiser is unsatisfactory to the Offering Partner, the personal representatives of the Decedent or Heir, the Withdrawing Partner or the Defaulting Partner, as the case may be, then within sixty (60) days after the date of the Appraisal Due Date, the Offering Partner, the personal representatives of the Decedent or Heir, the Withdrawing Partner or the Defaulting Partner, as the case may be, shall select an Appraiser (the "Partner's Appraiser") to determine the Fair Market Value of the Partnership's assets, and such Appraiser shall be directed to submit his determination thereof within sixty (60) days after the date of his selection.

18.2.3. If the appraisal made by the Partner's Appraiser is unsatisfactory to the remaining Partners, then the Partnership Appraiser and the Partner's Appraiser shall select a third Appraiser (the "Appraiser") to determine the Fair Market Value of the Partnership's assets and such Appraiser shall be directed to submit his determination thereof within sixty (60) days after the date of his selection. The Appraiser's determination thereof shall be binding upon the Partnership, the remaining Partners and the Offering Partner, the personal representatives of the Decedent or Heir, the Withdrawing Partner or the Defaulting Partner, as the case may be.

18.3.   Any and all appraisers selected in accordance with the provisions of this Section 18 shall be recognized professional appraisers or consultants regularly engaged in the business of evaluating businesses of the type or size of (or otherwise comparable to) the Partnership's business, who shall be directed to conduct their appraisals provided for in this Section 18 in accordance with generally accepted standards and used methods; and all costs and expenses (including professional fees) incurred in connection with any of the appraisals provided for in this Section 18 shall be borne equally by the remaining Partners, and the Offering Partner, the personal representatives of the Decedent or Heir, the Withdrawing or the Defaulting Partner, as the case may be.

**Section 19**

**<u>INSTALLMENT PAYMENTS</u>**

19.1.    If there shall be an election pursuant to the provisions of Sections 13.2, 14.2, 15.2 or 16.2 hereof to purchase (the Partner or the Partnership so purchasing shall be hereinafter, where appropriate, referred to as the "purchasing person") the Offering Partner's interest, the Decedent's Interest, the Withdrawing Partner's Interest or the Defaulting Partner's Interest, as the case may be (hereinafter where appropriate, referred to as the "Interest"), on an installment basis, then the terms and conditions of such installment purchase shall be as set forth in Section 19.1.1 and Section 19.1.2 in the case of an election pursuant to Section 13.2 or 14.2 and as set forth in Section 19.1.3 and Section 19.1.4 in the case of an election pursuant to Section 15.2 or 16.2 hereof.

19.1.1. ____% of the aggregate purchase price payable for such Interest (hereinafter, where appropriate, referred to as the "Aggregate Purchase Price") shall be paid on the closing date; and

19.1.2. The remainder of the Aggregate Purchase Price shall be paid in ____ equal consecutive annual installments on each anniversary of the closing date over a period, beginning with the year following the calendar year in which the sale occurred (hereinafter referred to as the "Installment Payment Period").

19.1.3. _____% of the aggregate purchase price payable for such Interest (hereinafter, where appropriate, referred to as the "Special Aggregate Purchase Price") shall be paid on the closing date; and

19.1.4. The remainder of the Special Aggregate Purchase Price shall be paid in ____ equal consecutive annual installments on each anniversary of the closing date over a period, beginning with the year following the calendar year in which the sale occurred (hereinafter referred to as the "Special Installment Payment Period").

19.1.5. Anything contained in this Section 19 to the contrary notwithstanding, the entire unpaid balance of the Aggregate Purchase Price or the Special Aggregate Purchase Price, as the case may be, shall become immediately due and payable upon the sale, exchange, transfer or other disposition of all or substantially all of the Property or assets of the Partnership.

19.1.6. In any purchase referred to in this Section 19 the purchaser shall pay simple interest at a rate that shall be equal to the publicly-announced prime rate of interest of _____ Bank (such interest rate hereunder to change from time to time simultaneously with any change in such publicly-announced prime rate) on the unpaid balance of the Aggregate Purchase Price or Special Aggregate Purchase Price on each anniversary of the closing date during the Installment Payment Period or Special Installment Payment Period, as the case may be.

19.2.   So long as any part of the Aggregate Purchase Price or the Special Aggregate Purchase Price remains unpaid, the Partners shall permit the Offering Partner, the personal representatives of the Decedent or the Heir, the Withdrawing Partner (or the legal representative of the Withdrawing Partner in the event of the bankruptcy of the Withdrawing Partner) or the Defaulting Partner, as the case may be, and the attorneys and accountants of each of the foregoing Persons, to examine the books and records of the Partnership and its business following the event that shall have given rise to the election referred to in Section 19.1 hereof during regular business hours from time to time upon reasonable prior notice and to receive copies of the annual accounting reports and tax returns of the Partnership.

## Section 20

## DELIVERY OF EVIDENCE OF INTEREST

On the closing date, upon payment of the Aggregate Purchase Price for the purchase of the Interest hereunder or, if payment is to be made in installments pursuant to the provisions of Section 19 hereof, upon the first payment, the Offering Partner, the Withdrawing Partner, the personal representative of the Withdrawing Partner (in the event of the bankruptcy of the Withdrawing Partner) or the Defaulting Partner, as the case may be, shall execute, acknowledge, seal and deliver to the purchasing person such instrument or instruments of transfer to evidence the purchase of the Interest (the "Instrument of Transfer") that shall be reasonably requested by counsel to the purchasing person in form and substance reasonably satisfactory to such counsel. If a tender of the Aggregate Purchase Price or Special Aggregate Purchase Price or, if payment is to be made in installments pursuant to the provisions of Section 19.1 hereof, the tender of the first payment thereof, shall be refused, or if the Instrument of transfer shall not be delivered contemporaneously with the tender of the Aggregate Purchase Price or Special Aggregate Purchase Price or of the first payment thereof, as aforesaid, then the purchasing person shall be appointed, and the same is hereby irrevocably constituted and appointed, the attorney-in-fact with full power and authority to execute, acknowledge, seal and deliver the Instrument of Transfer.

## Section 21

## MEETINGS OF PARTNERS

The annual meeting of the Partners shall be held on the first Tuesday in the month of January, at 10:00 A.M., at the principal office of the Partnership, for the purpose of transacting such business as may come before the meeting.  If the day fixed for the annual meeting shall be a legal holiday, such meeting shall be held on the next succeeding business day.

The Partners may by resolution prescribe the time and place for the holding of regular meetings and may provide that the adoption of such resolution shall constitute notice of such regular meetings.

Special meetings of the Partners, for any purpose or purposes, may be called by

any two Partners (or such other number of Partners as the Partners from time to time may specify).

Written or telephonic notice stating the place, day and hour of the meeting and, in the case of a special meeting, the purpose for which the meeting is called, shall be delivered not less than three days before the date of the meeting, either personally or by mail, to each Partner of record entitled to vote at such meeting.  When all the Partners of the Partnership are present at any meeting, or if those not present sign a written waiver of notice of such meeting, or subsequently ratify all the proceedings thereof, the transactions of such meeting shall be valid as if a meeting had been formally called and notice had been given.

At any meeting of the Partners, the presence of all of the Partners, as determined from the books of the Partnership, represented in person or by proxy, shall constitute a quorum for the conduct of the general business of the Partnership.  However, if any particular action by the Partnership shall require the vote or consent of some other number or percentage of Partners pursuant to this Agreement, a quorum for the purpose of taking such action shall require such other number or percentage of Partners.  If a quorum is not present, the meeting may be adjourned from time to time without further notice, and if a quorum is present at the adjourned meeting any business may be transacted which might have been transacted at the meeting as originally notified.  The Partners present at a duly organized meeting may continue to transact business until adjournment, notwithstanding the withdrawal of enough Partners to leave less than a quorum.

At all meetings of the Partners, a Partner may vote by proxy executed in writing by the Partner or by a duly authorized attorney-in-fact of the Partner.  Such proxy shall be filed with the Partnership before or at the time of the meeting.  No proxy shall be valid after three months from the date of execution, unless otherwise provided in the proxy.

If at any time a Partner is a corporation, partnership or limited liability company, the interest of such Partner may be voted by such officer, partner, agent or proxy of such Partner as the bylaws, board directors, or other organization documents of such entity may duly authorize.

A Partner of the Partnership who is present at a meeting of the Partners at which action on any matter is taken shall be presumed to have assented to the action taken, unless the dissent of such Partner shall be entered in the minutes of the meeting or unless such Partner shall file a written dissent to such action with the person acting as the secretary of the meeting before the adjournment thereof or shall forward such dissent by certified mail to the Partnership within fifteen days after the adjournment of meeting.  Such right to dissent shall not apply to a Partner who voted in favor of such action.

Unless otherwise provided by law, any action required to be taken at a meeting of the Partners, or any other action which may be taken at a meeting of the Partners, may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by all of the Partners entitled to vote with respect to the subject thereof.

Partners of the Partnership may participate in any meeting of the Partners by means of conference telephone or similar communication if all persons participating in such meeting can hear one another for the entire discussion of the matters to be voted upon. Participation in a meeting pursuant to this paragraph shall constitute presence in person at such meeting.

## Section 22

## ASSIGNMENT OF PARTNERSHIP INTERESTS

Except as otherwise provided in this Agreement, no Partner or other person holding any interest in the Partnership may assign, pledge, hypothecate, transfer or otherwise dispose of all or any part of his interest in the Partnership, including without limitation the capital, profits or distributions of the Partnership without the prior written consent of the other Partners in each instance.

The Partners agree that no Partner may voluntarily withdraw from the Partnership without the unanimous vote or consent of the Partners.

A Partner may assign all or any part of such Partner's interest in the allocations and distributions of the Partnership to any of the following (collectively the "permitted assignees"):  the spouse, parents, sisters, brothers, descendants, nieces or nephews of such Partner, other than a minor or incompetent; trust for the sole benefit of one or more of the foregoing; or any person, corporation, partnership or other entity as to which the Partnership has given consent to the assignment of such interest in the allocations and distributions of the Partnership by the unanimous vote or consent of the Partners.  An assignment to a permitted assignee shall only entitle the permitted assignee to the allocations and distributions to which the assigned interest is entitled, unless such permitted assignee applies for admission to the Partnership and is admitted to the Partnership as a Partner in accordance with this Agreement.

An assignment, pledge, hypothecation, transfer or other disposition of all or any part of the interest of a Partner in the Partnership in violation of the provisions hereof shall be null and void for all purposes.

No assignment, transfer or other disposition of all or any part of the interest of any Partner permitted under this Agreement shall be binding upon the Partnership unless and until a duly executed and acknowledged counterpart of such assignment or instrument of transfer, in form and substance satisfactory to the Partnership, has been delivered to the Partnership.

As between a Partner and an assignee or transferee of such Partner's interest in accordance with this Agreement, allocations and distributions for any fiscal year shall be apportioned as of the date of the assignment or transfer, on the basis of the number of days before and after said date, without regard to the results of the Partnership's operations before or after the assignment or transfer.

No assignment or other disposition of any interest of any Partner may be made if

such assignment or disposition, alone or when combined with other transactions, would result in the termination of the Partnership within the meaning of Section 708 of the Internal Revenue Code or under any other relevant section of the Code or any successor statute.  No assignment or other disposition of any interest of any Partner may be made without an opinion of counsel satisfactory to the Partnership that such assignment or disposition is subject to an effective registration under, or exempt from the registration requirements of, the applicable federal and state securities laws.  No interest in the Partnership may be assigned or given to any person below the age of 21 years or to a person who has been adjudged to be insane or incompetent.

Anything herein contained to the contrary, the Partnership shall be entitled to treat the record holder of the interest of a Partner as the absolute owner thereof, and shall incur no liability by reason of distributions made in good faith to such record holder, unless and until there has been delivered to the Partnership the assignment or other instrument of transfer and such other evidence as may be reasonably required by the Partnership to establish to the satisfaction of the Partnership that an interest has been assigned or transferred in accordance with this Agreement.

**Section 21**

**FAMILY MEMBERS**

For purposes of this Agreement, members of the "immediate family" of a Partner are hereby defined to be such person's spouse or children.

**Section 22**

**DISSOLUTION AND LIQUIDATION**

The Partnership shall terminate upon the occurrence of any of the following:  the expiration of the period fixed for the duration of the Partnership pursuant to this Agreement, as the same may be extended by the Partners; the election by the Partners to dissolve the Partnership made by the unanimous vote or consent of the Partners; the occurrence of a Withdrawal Event with respect to a Partner and the failure of the remaining Partners to elect to continue the business of the Partnership as provided for in this Agreement; or any other event which pursuant to this Agreement, as the same may hereafter be amended, shall cause a termination of the Partnership.

The liquidation of the Partnership shall be conducted and supervised by a person designated for such purposes by the unanimous vote or consent of the Partners (the "Liquidating Agent").  The Liquidating Agent hereby is authorized and empowered to execute any and all documents and to take any and all actions necessary or desirable to effectuate the dissolution and liquidation of the Partnership in accordance with this Agreement.

Promptly after the termination of the Partnership, the Liquidating Agent shall cause to be prepared and furnished to the Partners a statement setting forth the assets and liabilities of the Partnership as of the date of termination.  The Liquidating Agent, to the extent

practicable, shall liquidate the assets of the Partnership as promptly as possible, but in an orderly and businesslike manner so as not to involve undue sacrifice.

The proceeds of sale and all other assets of the Partnership shall be applied and distributed in the following order of priority:  (a) to the payment of the expenses of liquidation and the debts and liabilities of the Partnership, other than debts and liabilities to Partners; (b) to the payment of debts and liabilities to Partners; (c) to the setting up of any reserves which the Liquidating Agent may deem necessary or desirable for any contingent or unforeseen liabilities or obligations of the Partnership, which reserves shall be paid over to an attorney-at-law admitted to practice in the State of New York as escrowee, to be held for a period of two years for the purpose of payment of the aforesaid liabilities and obligations, at the expiration of which period the balance of such reserves shall be distributed as hereinafter provided; (d) to the Partners in proportion to their respective capital accounts until each Partner has received cash distributions equal to any positive balance in his capital account, in accordance with the rules and requirements of Trea. Reg. Section 1.704-1(b)(2)(ii)(b); and (e) to the Partners in proportion to the Partners' Percentage Interests.

If any Partner has a deficit balance in his capital account following the liquidation of his interest in the Partnership, as determined after taking into account all capital account adjustments for the Partnership tax year during which such liquidation occurs, such Partner shall restore the amount of such deficit balance to the Partnership by the end of such taxable year (or, if later, within ninety days after the date of such liquidation), which amount shall, upon liquidation of the Partnership, be paid to the creditors of the Partnership or distributed to the other Partners in accordance with their positive capital account balances and the rules and requirements of Trea. Reg. Section 1.704-1(b)(2)(ii)(b).

The liquidation shall be complete within the period required by Trea. Reg. Section 1.704-1(b)(2)(ii)(b).

If the Liquidating Agent shall determine that it is not practicable to liquidate all of the assets of the Partnership, the Liquidating Agent may retain assets having a fair market value equal to the amount by which the net proceeds of liquidated assets are insufficient to satisfy the debts and liabilities referred to above.  If, in the absolute judgment of the Liquidating Agent, it is not feasible to distribute to each Partner his proportionate share of each asset, the Liquidating Agent may allocate and distribute specific assets to one or more Partner in such manner as the Liquidating Agent shall determine to be fair and equitable, taking into consideration the basis for tax purposes of each asset.

A taking of all or substantially all of the Property by condemnation or eminent domain shall be treated as a sale of the Property upon the dissolution of the Partnership.  In such event any portion of the Property not so taken shall be sold, and the proceeds of such sale and the award for such taking shall be distributed in the manner provided for in this Article 16.  In the event of a sale of the Property or a taking of less than substantially all of the Property, which sale does not result in a termination or dissolution of the Partnership, the proceeds of such sale and the award for such taking shall be distributed in the manner provided for in this Article 16.

For purposes of allocating gain on the sale of the Property and other assets of the Partnership, gain shall be first allocated to the Partners to the extent cash or other property was distributed to them pursuant to this Article 16 and the balance of such gain shall be allocated in proportion to the Partners' Percentage Interests.

Upon compliance with the distribution plan, the Partners shall cease to be such, and the Partnership shall execute, acknowledge and cause to be filed such certificates and other instruments as may be necessary or appropriate to evidence the dissolution and termination of the Partnership.

## Section 23

## NOTICES

Any and all notices, offers, acceptances, requests, certifications and consents provided for in this Agreement shall be in writing and shall be given and be deemed to have been given when personally delivered against a signed receipt or mailed by registered or certified mail, return receipt requested, to the last address which the addressee has given to the Partnership. The address of each Partner is set under his signature at the end of this Agreement, and each Partner agrees to notify the Partnership of any change of address. The address of the Partnership shall be its principal office. Email with receipt acknowledged by recipient shall be proper and valid notice.

## Section 24

## AMENDMENTS

This Agreement may not be altered, amended, changed, waived or modified in any respect or particular unless the same shall be in writing and agreed to by the unanimous vote or consent of the Partners. No amendment may be made to the financial interests of the Partners, except by the vote or consent of all of the Partners. No amendment of any provision of this Agreement relating to the voting requirements of the Partners on any specific subject shall be made without the affirmative vote or consent of at least the number or percentage of Partners required to vote on such subject.

## Section 25

## MISCELLANEOUS PROVISIONS

24.1.   This Agreement shall be binding upon, and inure to the benefit of, all parties hereto, their personal and legal representatives, guardians, successors, and their assigns to the extent, but only to the extent, that assignment is provided for in accordance with, and permitted by, the provisions of this Agreement.

24.2.   The Partners agree that they and each of them will take whatever action or actions as are deemed by counsel to the Partnership to be reasonably necessary or desirable from time to

time to effectuate the provisions or intent of this Agreement, and to that end the Partners agree that they will execute, acknowledge, seal and deliver any further instruments or documents which may be necessary to give force and effect to this Agreement or any of the provisions hereof, or to carry out the intent of this Agreement, or any of the provisions hereof.

24.3.   Throughout this Agreement, where such meanings would be appropriate: (a) the masculine, feminine and neuter genders shall each be deemed to include and refer to the other two, and (b) the singular shall be deemed to include the plural and vice versa. The headings herein are inserted only as a matter of convenience and reference, and in a way define, limit or describe the scope of the Agreement, or the intent of any provisions thereof.

24.4.   This Agreement and any exhibits attached hereto set forth all (and are intended by all parties hereto to be an integration of all) of the promises, agreements, conditions, understandings, warranties and representations among the parties hereto with respect to the Partnership, the business of the Partnership and the property of the Partnership, and there are no promises, agreements, conditions, understandings, warranties or representations, oral or written, express or implied, among them other than as set forth herein.

24.5.   Nothing contained in this Agreement shall be construed as requiring the commission of any act contrary to law. If there is any conflict between any provision of this Agreement and any statute, law, ordinance or regulation contrary to which the Partners have no legal right to contract, the later shall prevail, but in such event the provisions of this Agreement thus affected shall be curtailed and limited only to the extent necessary to conform with said requirement of law. If any part, article, section, paragraph or clause of this Agreement shall be held to be indefinite, invalid or otherwise unenforceable, the entire Agreement shall not fail on account thereof, and the balance of the Agreement shall continue in full force and effect.

24.6.   The Partnership shall have the right to make application for, take out and maintain in effect such policies of life insurance on the lives of any or all of the Partners, whenever and in such amounts as the Partners acting in accordance with Section 8 shall determine. Each Partner shall exert his or her best efforts and frilly assist and cooperate with the Partnership in obtaining any such policies of life insurance.

24.7   This Agreement and the rights and liabilities of the parties hereunder shall be governed by and determined in accordance with the laws of the State of New York.

24.8   All the provisions of this Agreement is intended to be severable.  If any provision of this Agreement shall be invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions of this Agreement, which shall remain in full force and effect.

25.9   This Agreement, and any amendments hereto may be executed in counterparts all of which taken together shall constitute one agreement.  Electronic signatures shall be deemed as original signatures.

25.10   No provision of this Agreement is intended to be for the benefit of or enforceable by any third party.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the date first above written.

_____
Cheskel Landau
Address:


_____
Joseph Katz
Address:


ACKNOWLEDGMENTS

STATE OF NEW YORK          )
                                                    : SS.
COUNTY OF                            )

On the _____ day of May, in the year 2021, before me, the undersigned, a Notary Public in and for said State, personally appeared Cheskel Landau, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


_____
Notary Public

STATE OF NEW YORK          )
                                                    : SS.
COUNTY OF                            )

On the _____ day of May, in the year 2021, before me, the undersigned, a Notary Public in and for said State, personally appeared Joseph Katz, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.


_____
Notary Public

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the date first above written.

Cheskel Landau
Address:

Joseph Katz
Address:

## ACKNOWLEDGMENTS

STATE OF NEW YORK   )
                    : SS.
COUNTY OF          )

On the ____ day of May, in the year 2021, before me, the undersigned, a Notary Public in and for said State, personally appeared Cheskel Landau, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

ZVI E. AUMAN
Notary Public, State of NY
No. 01AU6275370
Qualified in Kings County
Comm. Expires 01/28/2025

STATE OF NEW YORK   )
                    : SS.
COUNTY OF          )

On the ____ day of May, in the year 2021, before me, the undersigned, a Notary Public in and for said State, personally appeared Joseph Katz, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

ZVI E. AUMAN
Notary Public, State of NY
No. 01AU6275370
Qualified in Kings County
Comm. Expires 01/28/2025

21